IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


UNITED STATES OF AMERICA,                    07-CR-50-01-BR

            Plaintiff,                       OPINION AND ORDER

v.

JORGE ORTIZ OLIVA, and
PABLO BARAJAS LOPEZ, et al.,

            Defendants.


KENT S. ROBINSON
Acting United Sates Attorney
KATHLEEN L. BICKERS
Assistant Untied States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR 97204
(503) 727-1000

        Attorneys for Plaintiffs

THOMAS K. COAN
1001 S.W. Fifth Ave., Suite 1400
Portland, OR 97204
(503) 221-8736

        Attorney for Defendant Jorge Ortiz Oliva


1  - OPINION AND ORDER

**JOHN E. STORKEL**
1415 Liberty St., S.E.
Salem, OR 97302
(503) 363-6625

   Attorney for Defendant Pablo Barajas Lopez

**BROWN, Judge.**

   This matter comes before the Court on Defendant Jorge Ortiz Oliva's Motion to Suppress (#344) Wiretap Evidence on the ground that the government's Affidavits in support of its applications for authorization of numerous wiretap orders do not establish the necessity for such orders.

   For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion.


<u>**BACKGROUND**</u>

   The government's multi-count Second Superseding Indictment charges that Oliva and others participated in a drug-trafficking conspiracy involving the distribution, manufacture, and possession of, with intent to distribute, at least 500 grams of methamphetamine, five kilograms of cocaine, and 1000 kilograms of marijuana.  Some of the evidence supporting the charges was obtained from wiretaps of conversations on 23 separate cell phones.  The wiretaps were authorized pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2518.  Multiple wiretap orders were in place and

2  - OPINION AND ORDER

conversations intercepted between August 2006 and June 2007.

Oliva challenges the admissibility of intercepted conversations on 22 of the cell phones on the ground that the government did not establish the wiretaps were necessary. Oliva argues the government (1) did not in good faith try to use traditional investigatory techniques focusing on Oliva and Defendant Fermin Villasenor Ramirez before seeking wiretap orders, (2) bungled the investigation, and (3) failed to make individualized showings of necessity in seeking wiretap orders on phones used by subordinates of Oliva and Ramirez.

## STANDARDS

**A.    Standing.**

An individual has standing to challenge a cell-phone wiretap order for lack of necessity if he has "a reasonable expectation of privacy in the place where the wiretap was used" (*U.S. v. Gonzalez, Inc.*, 412 F.3d 1102, 1116 (9th Cir. 2005)) or his "privacy was actually invaded" because he was "a participant in an intercepted conversation, or [] such conversation occurred on his premises" (*U.S. v. King*, 478 F.2d 494, 506 (9th Cir. 1973)).

**B.    Necessity.**

The government must establish the necessity for a Title III wiretap order by presenting to the issuing judge "a full and

3  - OPINION AND ORDER

complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).

The "necessity requirement exists in order to limit the use of wiretaps, which are highly intrusive." *U.S. v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000).  The court must exercise its discretion in determining the necessity for the wiretap "in a practical and common-sense fashion." *Gonzalez, Inc.*, 412 F.3d at 1115. *See also U.S. v. Commito*, 918 F.2d 95, 98 (9th Cir. 1990).  "[T]he wiretap should not ordinarily be the initial step in the investigation, but [] law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." *U.S. v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002).  "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to 'develop an effective case against those involved in the conspiracy.'" *U.S. v. Rivera*, 527 F.3d 891, 901 (9th Cir. 2008)(internal citations omitted).

## DISCUSSION

### A.    Standing.

The government asserts Oliva has not established that he has standing to object to the wiretap orders because he does not

4 - OPINION AND ORDER

identify or object to specific conversations that occurred on his cell phones or conversations to which he was a party on other cell phones. The Court disagrees.

Oliva asserts he has standing to challenge the necessity of wiretaps on his cell phones (identified as TT 2, TT 4, TT 8, TT 12, TT 14, TT 15, TT 19, and TT 23) or wiretaps on cell phones on which he was a party to the conversations being intercepted. The government is well aware of the specific conversations that were intercepted on Oliva's cell phones and conversations in which Oliva participated on other cell phones that were also intercepted. The government does not identify any other conversations that are challenged by Oliva in his Motion to Suppress.

On this record, the Court concludes Oliva has standing to challenge the government's need to obtain the wiretap orders that are the subject of this Motion.

**B.    Necessity.**[1]

The government's Affidavits in support of each of the requests for wiretap orders as well as reports from early 2006 through April 2007 generally describe the course of the investigation at pertinent times, investigative techniques that

--------

[1] The Court considers only Oliva's specific challenges to the sufficiency of the government's Affidavits in support of wiretap orders that are set forth in the Argument section of Oliva's Memorandum.

5  - OPINION AND ORDER

failed or were rejected, the time frame for the requested wiretaps, and the government's minimization procedures to avoid unauthorized wiretaps.  The government asserts the Affidavits adequately establish the need for more than traditional investigative techniques because of the geographic scope and large number of people involved in the drug-trafficking conspiracy.

Oliva asserts the government's initial use of traditional investigative techniques, including *inter alia*, the use of body wires on confidential sources (CSs) and other sources of information (SOIs), video surveillance, and pen register trap/trace devices, were successful in "uncovering evidence about the nature and scope of the drug-trafficking activities, its alleged members, stash houses, vehicles, mode of operation, and the like."  Def.'s Mem. at 54.  Despite its success, Oliva alleges the government improperly sought cell-phone wiretaps to supplant effective traditional investigatory techniques and "bungled the investigation."  *Id*. at 55.

1.    **Success of Investigation without Wiretap Orders.**

Oliva contends the government did not need to wiretap Oliva's cell-phone conversations because traditional investigative techniques were successful.

a.    Use of CS-1 and CS-2; Manuel Mendoza Diaz Arrest.

In February 2006, six months before the government

sought the first wiretap order, CS-1 and CS-2 successfully carried out two controlled drug-buys from Manuel Mendoza Diaz involving alleged conspirators Defendants Francisco Javier Garibay and Ramirez, which led to the identification of their vehicles, information as to their *modus operandi,* and the location of their residences and stash house.  The drug-buys were videotaped and recorded on body wires worn by CS-1 and CS-2. Diaz, who is Ramirez's nephew, was arrested shortly thereafter. He refused to cooperate in the government's investigation.  The State then dismissed the drug charges against him and released him on a United States Immigration and Customs Enforcement (ICE) detainer for subsequent deportation.  Oliva asserts the government unnecessarily stopped using CS-1 and CS-2 despite their success in penetrating the drug conspiracy and the resulting arrest of Diaz.

In his initial Affidavit in support of a wiretap order as to TT-1 and TT-2 in August 2006, Task Force Officer (TFO) Darrin Phillips stated CS-1 had "low level access" to Ramirez's organization.  In addition, TFO Phillips was unaware the State had dismissed the charges against Diaz and incorrectly understood that arrest warrants would be issued and Diaz would be prosecuted along with Ramirez if Diaz ever returned to the United States following his deportation.  As a result, neither CS-1 nor CS-2 were in a position to participate further in the investigation of

Ramirez because they had both provided information to the
government for purposes of obtaining the search warrant of
Ramirez's stash house.  In addition, although the government
concedes Diaz's arrest "was helpful in providing probable cause
into the group's activities," the government also asserts the
investigation was not proceeding sufficiently to obviate the need
for a wiretap order on Ramirez's phone (TT-1).

      b.  <u>Use of CS-4 in Garcia Investigation</u>.

      Oliva asserts CS-4 successfully conducted a controlled
drug-buy with Defendant Jose Robert Garcia and, in the process,
learned Garcia's name, identified the vehicle he used, and found
out his address.  Oliva, however, also contends the government
failed to use CS-4 even after CS-4 advised TFO Phillips that
Garcia told CS-4 he had a "friend" who would be willing to sell
him pseudoephedrine, which is a nasal decongestant often used in
the manufacture of methamphetamine.  Oliva surmises he was
presumably "the friend" because at that time he was negotiating
to purchase pseudoephedrine in California.  According to Oliva,
TFO Phillips did not have any interest in pursuing this lead and
misstated the nature of this potential transaction in his
Affidavit in support of a wiretap order by asserting "CS-4 stated
that GARCIA also indicated that his friend would be willing to
sell pills to *other individuals in the area*."  In the police
report describing the same conversation, however, TFO Phillips

8  - OPINION AND ORDER

stated the friend would be willing to sell the pills "*to the CS.*"
Def.'s Mem., Ex. 2 at 26; Ex. 24 at 3 (emphasis added).
Nonetheless, in his Affidavit as to the TT-6 and TT-7 Wiretap
Orders, TFO Phillips stated CS-4 was of limited value because he
was only able to identify Garcia.  In addition, CS-4 was unable
to contact Garcia because he did not know Garcia's address and
Garcia had changed cell-phone numbers.

Finally, the government rejects Oliva's contention that
TFO Phillips misled the court because, in fact, he mentioned the
possible purchase of pseudoephedrine in his Affidavit.

c.  Use of FBI CS-5.

Oliva argues FBI informant CS-5 had several meetings in
June 2006 in California with an Oregon group who wanted to
purchase large quantities of pseudoephedrine.  The Oregon group
included Oliva and Garcia.  Shortly thereafter, FBI agents
in California stopped Defendant Pedro Lopez Cruz while he was
driving an automobile that contained a large quantity of
pseudoephedrine.  The automobile had initially been driven to a
pick-up location by Garcia.  At the time of his arrest, Cruz had
made 49 calls on a cell-phone number used by Oliva.  Oliva
immediately stopped using that number.  Oliva asserts the
government did not fully exploit CS-5.

.

TFO Phillips "determined that CS-5 had been 'burned'" as a result of Cruz's arrest.  Later it appears TFO Phillips's assumption was corroborated by Garcia.  In any event, in the Affidavit in support of the TT-1 and TT-2 wiretap orders, TFI Phillips stated CS-5 had "no way . . . to contact [Garcia or Oliva] without compromising CS-5's strategic position . . . and/or arousing suspicion about CS-5's true motives." Accordingly, "[w]ithout a direct line to the key conspirators, CS-5 was incapable of dismantling or disrupting the group."

     d.  <u>Use of SOI-2</u>.

Oliva contends SOI-2 provided useful information to the government regarding the conspiracy, including descriptions of the activities of the Defendants and identification of "vehicles, residences, phone numbers, and other information."  The government, however, did not follow-up on SOI-2's offer to continue in that role.

The government responds SOI-2 told TFO Phillips that he/she had a close relationship with Oliva, Ramirez, and Defendant Jose Gamino Villasenor and also knew about Garcia's activities.  SOI-2, however, was fearful of becoming involved in the investigation.  SOI-2 agreed to attempt to contact Garcia to set up a "reverse-buy" with an undercover agent who would supply drugs to Garcia.  SOI-2 did not want to purchase the drugs directly because Garcia knew he/she was not a dealer and he/she

10 - OPINION AND ORDER

would draw suspicion.  SOI-2 had a "risky" direct meeting with
Garcia, but Garcia "would not take the bait."  SOI-2, therefore,
was unable "to advance the goals of the investigation."  SOI-2
continued to provide useful intelligence to the government but
remained unable to purchase drugs directly because of the
suspicion it might arouse in light of SOI-2's lack of a drug-
dealing history.

   e. <u>Use of Informant CS-6</u>.

   Oliva asserts the government did not adequately
use CS-6 even though CS-6 was typical of the kind of informant
who could have helped the government in its investigation of
Oliva without the need for resorting to wiretap orders.  For
instance, CS-6 told TFO Phillips that he used to work with Garcia
distributing methamphetamine and that Garcia was connected to
Oliva.

   TFO Phillips, however, stated in his Affidavit in
support of the TT-4 and TT-5 Wiretap Orders that CS-6 had "fled
the area and . . . has not been located."  Oliva does not explain
how CS-6 could have effectively aided the government after he
fled the area.

   f. <u>Use of CS-7</u>.

   Oliva asserts the government dismissed informant CS-7
as a useful source even though he had contacts in the
organization who were "higher up" than Oliva.  In his Affidavit

for a wiretap order for TT-19, Agent Joshua Cook stated CS-7's
family was murdered by this organization.  Consequently, CS-7
feared for his life and did not want to cooperate directly
against Oliva.  Thus, Agent Cook believed CS-7's usefulness would
be limited, and "it would not be feasible to use this CS in an
attempt to infiltrate" the organization.

> g.  <u>Southern Oregon Marijuana Operation</u>.

In August 2006, before the government applied for
wiretap orders for TT-6 and TT-7, Jackson County, Oregon, law-
enforcement officers discovered "vast marijuana fields" in the
Medford area.  The Jackson County Sheriff decided to have the
fields eradicated because of public-safety concerns.  The
government connected Defendants Oliva and Jeremy Noel Sequin to
the fields, and the Drug Enforcement Agency (DEA) advised the
Sheriff that the eradication of the fields might adversely impact
the ongoing DEA investigation of Oliva and his co-conspirators.
Nevertheless, the Sheriff proceeded with the eradication program
in September 2006.  At least eight individuals connected to the
marijuana-grow operation were arrested.  All of them denied any
involvement in the operation.  They were never charged with drug
offenses, but they were deported.

Oliva faults the government for deporting these
individuals rather than attempting to use them in the continuing
investigation against him, "thereby letting another opportunity

for fruitful investigation slip by in favor of the ongoing wiretap."

TFO Scotty W. Nowning asserted in his Affidavit in support of wiretap orders for TT-6 and TT-7 that none of the eight individuals "can be used as informants or sources of information in this case because they are not charged with a drug related crime. Approaching these individuals and asking them about targets of this investigation presents a high likelihood of compromising the case." Pl.'s Mem. at 23; Def.'s Mem., Ex. 4 at 44. The government explains all eight individuals denied knowledge of the marijuana fields and "fabricated a variety of different stories for their presence in Southern Oregon. . . . Questioning these individuals about specific targets of the investigations would have revealed the ongoing investigation to the larger conspiracy and to the targets who orchestrated the grow." Pl.'s Mem. at 27. They were "not prepared to be truthful" about their own involvement with the marijuana grows much less the involvement of others who remained at large.

      h.   <u>Use of SOI-3</u>.

TFO Nelson arrested SOI-3 in June 2006 on unrelated drug charges. Three months later, SOI-3 agreed to talk to law-enforcement officials. Nelson interviewed SOI-3 in jail twice in early-to-mid-September 2006. TFO Nowning spoke with TFO Nelson

about these interviews on September 21, 2006, the same day he sought a wiretap order for TT-6 and TT-7.  The government asserts SOI-3 was able to confirm information that the DEA already knew, but SOI-3 could not provide any new information. A week later, TFO Nowning filed an Affidavit in support of a wiretap order for TT8 and TT-9 and recited his experience with SOI-3.  In explaining the limited use that SOI-3 could be in the investigation, TFO Nowning stated SOI-3 was an illegal alien in jail on drug-trafficking charges, and his cooperation outside of jail, therefore, was not possible.  Moreover, because SOI-3 had been in jail for three months, "the likelihood of his making successful telephone calls to conspiracy members was outweighed by the likelihood the members of this conspiracy would think SOI-3 was working with law enforcement."  Pl.'s Mem. at 29.

According to Oliva, however, SOI-3 obtained a sentence of probation in October 2006.  By February 2007, as shown by calls intercepted by the government, SOI-3 was still discussing drug deals with Oliva.  In fact, SOI-3 was deported to Mexico, and the intercepted telephone calls were likely made from there.

The government responds it would have been much more difficult "for a jailed cooperator, recently arrested on drug charges, to gain the trust of higher-ups in a sophisticated conspiracy versus a deported drug dealer probably calling from the relative immunity of Mexico."  Pl.'s Mem. at 30.

14 - OPINION AND ORDER

i.  Use of SOI-4.

Special Agent Louis Nalepa interviewed SOI-4 in April
2007 following an unrelated drug investigation.  During the
interview, SOI-4 indicated he had information regarding Oliva.
SOI-4, however, was no longer in contact with Oliva, and his
information was old.  On May 22, 2007, Agent Nalepa again
interviewed SOI-4, who provided another cell-phone number for
Oliva and indicated a willingness to set up a drug transaction
using that cell-phone number.  The government, however had
already obtained a wiretap order for that cell-phone number
(TT23) on May 10, 2007.  The last call Oliva made on it was on
May 18, 2007, and the cell phone was no longer being used.  The
government did not trust SOI-4 sufficiently "to possibly disclose
. . . that they were already intercepting Oliva and therefore
knew his new number."  In any event, the government's
investigation was winding down by then, and Oliva was arrested on
June 7, 2007.

**2.   The Government's "Bungled" Investigation.**

Oliva contends wiretap orders were needed in part because
the government "bungled" its investigation of Oliva.

a.  Use of CS-3 in Ramirez Investigation.

Oliva asserts CS-3 was another traditional source
available to the government in its investigation of Ramirez and
"other targets."  Oliva contends, however, the government

15 - OPINION AND ORDER

compromised CS-3's usefulness by bungling a delivery of one pound of methamphetamine to Ramirez, who detected the presence of ATF agents at the scene.  The ATF agents never found the methamphetamine.

The government points out that the delivery occurred during the course of a separate investigation of Ramirez by ATF for illegal firearms activities.

b.  <u>Ramirez's Arrest</u>.

Oliva asserts the government blundered by having Ramirez arrested while he was on his way to deliver drugs.  Local police officers performed a pretext stop based on a traffic violation, searched the car, and found eight ounces of methamphetamine.  Charges, however, were dismissed because "further investigation was required."

The government, in turn, argues the stop not only produced evidence for use against the conspirators, but the conspirators also had less reason to suspect that they were part of a larger federal investigation.

3.  **Extension of Wiretap orders to Subordinates.**

Oliva asserts the government should have but did not make individualized showings of necessity for wiretapping cell phones of subordinates of Oliva and Ramirez.

a.  <u>Wiretap on Cell-Phones TT6 and TT7</u>.

In September 2006, the government obtained a wiretap

16 - OPINION AND ORDER

order to intercept conversations on cell-phones TT-6 and TT-7,
which were used by "subordinate" conspirator Villasenor.

Oliva asserts a wiretap order was unnecessary because
Villasenor had been a target of the investigation for only one
month, and more traditional investigative techniques could and
should have been used by the government before resorting to
wiretapping.  Oliva also asserts TFO Nowning's Affidavit merely
incorporated the same goals and objectives stated in earlier
affidavits.  In addition, Oliva's new cell-phone numbers could
have been obtained from other sources such as SOI-2 without
resorting to wiretapping a subordinate's cell phones.  In any
event, the government already knew about a new cell-phone number
that belonged to Oliva.

The government points out that TT6 and TT7 were new
cell-phone numbers being used by both Villasenor and Oliva and
that the frequency of Oliva's use of four other cell phones had
been sharply reduced or had stopped entirely.  Moreover, the
goals and objectives set forth in the wiretapping applications
pertaining to Oliva's discarded cell phones were relevant to
the wiretapping of the replacement cell phones because those
goals and objectives were the same and/or similar.  The
government also point out that its Affidavit specifically
indicated SOI-2's information regarding Oliva's use of new cell
phones "was often slow to get to investigators"; *i.e.,* "days or

17 - OPINION AND ORDER

weeks."

          In any event, the government argues even though it knew
the number of a new cell phone (TT8) in Oliva's possession, the
wiretapping of TT6 and TT7 led to evidence of Oliva's use of TT8,
which, in turn, led to another wiretap order.  The evidence the
government gathered from that wiretap order gave the government
the capability to broaden the scope of its investigation.

          b.   <u>Wiretap of Cell-Phones TT10 and TT11</u>.

          In October 2006 the government obtained a wiretap
order to intercept conversations on cell-phones TT10 and TT11,
which were used by Defendants Lopez and Villasenor respectively.

          Oliva asserts TFO Phillips's Affidavit for the wiretap
order does not reflect any attempts by the government to
investigate Lopez "through traditional means" or any renewed
effort to investigate Villasenor "through normal means."

          Neither the government's Affidavit in support of the
wiretap order nor its Memorandum in opposition to Oliva's Motion
to Suppress offer any support for a wiretap order based on
necessity as to TT10, the cell phone used by Lopez.

          In addition, the government's Affidavit in support of
a wiretap order as to TT11, the cell phone used by Villasenor,
relies solely on an incident during which Villasenor, while
driving, did a sudden u-turn in the middle of street.  The
government describes Villasenor's behavior as characteristic of

someone engaging in "counter-surveillance techniques" in order
"to detect a tail."  The government does not offer any reason as
to why this incident, standing alone, would justify the issuance
of a wiretap order.

In November 2006 the government obtained a wiretap
order extending the time it was authorized to intercept TT10 and
TT11.  The Affidavit does not contain any additional information
that would otherwise support the extension of a wiretap order
that was not justified in the first instance.

c.   <u>Wiretap of Cell-Phone TT16</u>.

In February 2007 the government obtained a wiretap
order to intercept conversations on cell-phone TT16, which was
used by Defendant Bonifacio Pedraza Villanueva.

Oliva asserts TFO Phillips failed to provide "a full
and complete statement as to whether traditional investigatory
techniques had been attempted in good faith."  Specifically,
Oliva contends even though TFO Phillips stated the government's
investigation had already identified two stash houses, TFO
Phillips requested a wiretap order to further the investigation
of those stash houses.

In response, the government points out that the
Affidavits reflect two "possible stash locations" had been
identified but not confirmed.  TFO Phillips asserted the location
of the possible stash houses (one on a cul-de-sac and the other

19 - OPINION AND ORDER

in an apartment complex whose occupants and visitors were aware of cars in the immediate vicinity) made traditional investigative techniques difficult; for example, techniques such as visual surveillance.

        d.  <u>Wiretap of Cell-Phone TT22</u>.

In May 2007, the government obtained a wiretap order as to cell-phones TT19, TT20, TT21, TT22, and TT23.  Oliva asserts the government's Affidavit as to TT22 is insufficient to support a wiretap order because it justifies the need for a wiretap solely on the ground that Villasenor and others were aware of police surveillance.

The government does not specifically respond to this argument.  In support of the need for an additional wiretap order on cell-phone TT22, however, the Court notes TFO Phillips stated his concern that recently intercepted cell-phone calls over TT14, TT15, TT17, and TT19 reflected Oliva was aware there were "buzzards" around (*i.e.*, "law enforcement" who were following them).  As a result, "[s]everal times during this investigation, surveillance has been identified by the target subjects, which has caused them to change telephones."  TFO Phillips requested additional wiretap orders from the Court, including an order covering cell-phone TT22, because "extended surveillance of this organization without the complement of wire intercepts would further alert the targets that law enforcement is investigating

20 - OPINION AND ORDER

them and subsequently compromise the investigation." Def.'s
Mem., Ex. 13 at 79.

**4. Analysis.**

The Court has reviewed the government's Affidavits in
support of wiretap orders for the cell phones in question and
concludes, with the exception of the wiretap orders for TT10 and
TT11, the Affidavits establish (1) the government's need to
obtain information outside of traditional law-enforcement
investigation techniques to establish Oliva's alleged involvement
in an ongoing drug conspiracy and (2) the need for the
government's extension of the investigation to subordinates of
Oliva and Ramirez.  The Court also concludes the need for the
wiretap orders did not result from any alleged "bungling" of the
investigation by the government.

In addition, the Court finds the size of the conspiracy, its
geographic scope, and the facility with which Oliva adjusted his
methods of operation and communication for the purpose of
frustrating  the government's use of traditional investigative
techniques justified the government's requests to intercept
Oliva's cell-phone conversations and to expand those
interceptions in response to countermeasures taken by Oliva and
others.  The Court also concludes, however, the government did
not present evidence sufficient to justify the wiretap orders for
cell-phones TT10 and TT11.

21 - OPINION AND ORDER

Accordingly, the Court grants Oliva's Motion to the extent that all evidence obtained as a result of information obtained from wiretapped conversations on TT10 and TT11 is suppressed. The Court denies the remaining part of Oliva's Motion to Suppress.

## CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendant Jorge Ortiz Oliva's Motion (#344) to Suppress Wiretap Evidence.   Specifically, the Court suppresses only that evidence obtained by the government as a result of information obtained from the government's wiretaps of cell-phones TT10 and TT11.

IT IS SO ORDERED.

DATED this 7th day of August, 2009.

ANNA J. BROWN
United States District Judge

22 - OPINION AND ORDER